COOPER (PATTON v.). See Case No. 10,834.

COOPER (PRESTON v.). See Case No. 11,-395.

COOPER (RENWICK v.). See Case No. 11,-701.

COOPER (RILEY v.). See Case No. 11,836.

## Case No. 3,201.

### COOPER v. ROBERTS.

[6 McLean, 93.][1]

Circuit Court, D. Michigan. June Term, 1854.[2]

FRAUDULENT LAND PATENT — SCHOOL LANDS — RESERVATION.

1. Fraud may be shown in procuring a patent at law, as the execution of a deed, being executed fraudulently, may be avoided at law. But in neither case can fraud be alleged and proved at law, except in the issuing of the patent, or, of the other, in the execution of the instrument.

2. Under a compact with a state to give to it section 16, unless it shall be sold or otherwise disposed of, congress have a right to reserve all mineral lands, and if section 16 contains mineral land, a section may be given, as provided in the compact, as contiguous to section 16 as may be.

3. The right to a particular tract, under the grant, did not exist until a survey was made, and if the section should be found to contain minerals, it is appropriated, by a general law reserving all such lands before survey, and another section for school lands must be selected.

4. The power of reserving lands for mines or salt springs, has uniformly been exercised by congress, notwithstanding the compact that section sixteen shall be given for schools, and other lands have been substituted for it. This is within the compact.

5. Doubts may exist whether the state of Michigan could sell the school lands without the consent of congress, as they were given in trust to the state, for school purposes.

[See note at end of case.]

[At law. Action of ejectment by James M. Cooper against Enoch C. Roberts to re-

[1] [Reported by Hon. John McLean, Circuit Justice.]
[2] [Reversed by the supreme court in Cooper v. Roberts, 18 How. (59 U. S.) 173.]

cover a part of section 16, in township 50 north, range 39 west, lying within the mineral district south of Lake Superior, in the state of Michigan. The plaintiff claims under the state, and the defendant claims through the Minnesota Mining Company, under a right of pre-emption from the United States.]

Vinton & Howard, for plaintiff.

Smith & Campbell, for defendant.

OPINION OF THE COURT. This is an action of ejectment, to recover the possession of one hundred and sixty acres of land claimed by the plaintiff, and of which the defendant is alleged to be in possession. The plaintiff claims under a patent from the state of Michigan, on a public sale. It was agreed that the land in controversy was advertised by the commissioner of the state land office, four weeks; that pursuant to the notice, Alfred Williams, for the sum of two thousand five hundred dollars, became the purchaser; that at the time of the sale he paid six hundred and forty dollars in part, and that afterwards he paid the full amount of the purchase money, and received the state land commissioner's certificate, which entitled him to a patent, and that in pursuance of the certificate the patent was issued to him. It is also admitted, that on the 19th of May, 1852, Williams, for the nominal consideration of ten thousand dollars, sold and conveyed the land by a quit claim deed to the plaintiff. The patent was in evidence, and also the deed from Williams to Cooper. In the compact made between the United States and Michigan, on its admission as a state into the Union, it is provided that, "section numbered 16 should be reserved for schools, in every township of the public lands within the state; and where such section has been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to the state for the use of schools." By an act of 1844, the state of Michigan established a land office, and appointed a commissioner, &c. And the same act provided that the "commissioner shall have the general charge and supervision of all lands belonging to the state, or which hereafter may become its property; and also all lands in which the state has an interest, or which may be held in trust by the state for any purpose mentioned in this title, and may superintend, lease, sell and dispose of the same in such manner as shall be directed by law." By a subsequent act, the Michigan legislature provided, that, "the minimum of the unsold and unimproved school lands shall be four dollars per acre; but no lands shall be otherwise sold until they shall once have been offered at public auction. Twenty-five per centum was required to be paid at the time of purchase; and a certificate of the purchase was to be made out by the com-

missioner, describing the land, price, and the terms of payment, &c. And if any sale should be made by mistake, or not in accordance with law, or obtained by fraud, the same shall be void. On the presentation of the certificate of purchase, given by the commissioner, the secretary of state was required to issue a patent.

The defendants alleged that the above patent was fraudulently procured; and witnesses were called to establish the fraud. To this evidence the plaintiff objected, that fraud could not be shown. But the court held, that fraud at law might be shown in the execution of a deed, or in the procurement of a patent, as well at law as in chancery; but that at law the fraud was limited to the execution of the instrument, and no matter behind that transaction was admissible as evidence to show fraud. Mr. Gibson, who is deputy secretary of state, filled up the patent, the governor having signed in blank. At the time, Governor Barry was not at the seat of government, and Mr. Gibson states that the patent was issued according to usage. Mr. Williams, the patentee, states, that the purchase was made by Bacon, in the name of the witness, without his knowledge or assent. In another instance a similar act was done by Bacon, and in that case as in this, he executed a quit claim deed. The consideration named in the deed to the plaintiff was nominal, so far as the witness was concerned. By the 57th section of the act of 1844, the legal assignee of a purchaser at the sale, is vested with the same rights as the original purchaser. Evidence was offered, to show that Bacon, who was substantially the purchaser, knew that the school section contained a valuable mine, and deceived the commissioner, &c. But the court held this was a question between the state and the purchaser.

1. The defendant's title consisted in the assignment of a miner's lease, dated 1845. 2. In a patent from the United States, dated 9th of April, 1852, reserving any right the state might have as school land. The reservation in the patent was, "any right which the state of Michigan may have in and to the east half of the northeast quarter, and the east half of the southeast quarter of section sixteen in town fifty, under or by virtue of the provisions of the act of 23d June, 1836" [5 Stat. 59]. The patent to the defendant was issued under the act of congress, 1st March, 1847 [9 Stat. 146], which was an act "to provide for the sale of mineral lands in the state of Michigan." The second section of this act requires, "that the secretary of the treasury shall cause a geological examination and survey of the lands embraced in said district, to be made and reported to the commissioner of the general land office. And the president is hereby authorized to cause such of said lands as may contain copper, lead, or other valuable ores,

to be exposed to sale, giving six months' notice of the time and places, &c., showing the number and localities of the mines known, the probability of discovering others, the qualities of the ores," &c. "And all the lands embraced in said district, not reported as aforesaid, shall be sold in the same manner as other lands are sold under acts now in force for the sale of the public lands, excepting and reserving from such sales section sixteen in each township for the use of schools, and such reservation as the president shall deem necessary for public use." The third section provides, "that all those persons who are in possession, by actual occupancy, of any portion of the district described in the first section of this act, under authority of a lease from the secretary of war, for the purpose of mining thereon, and who have fully complied with all the conditions and stipulations of said lease, may enter and purchase the same at any time during the continuance of such lease, to the extent of such lease, and no less, by paying to the United States therefor at the rate of two dollars and fifty cents per acre. Provided, that said entry and purchase shall be made to include the original survey of such lease, as near as may be, conforming to the lines of the public surveys of sections and subdivisions thereof. And all those persons who are in possession by actual occupancy, of any of said lands, for mining purposes, under authority of a written permit from the secretary of war, and who have visible landmarks and muniments as boundaries thereon, and who have in other respects complied with the conditions and stipulations contained in such permit, may enter and purchase the same, to the extent of the tract selected by them, and reported to the secretary of war, as required by said permit and no less, in the same manner as those who held under leases, and at the same price:" provided such entry and purchase be made before the day said land shall be offered for sale by order of the president; and in the same section, all who were in actual occupancy of mines before the law, and had paid rents, were authorized to purchase, &c. The fourth section provides, that all mineral lands shall be offered for sale in quarter sections, and no bid shall be received at a less rate than five dollars per acre.

The jury will observe that by the second section of the above act, the secretary of the treasury is to cause to be made a geological survey of the entire land district, in which shall be specially noted the extent and quality of the mines, and the distance from market. All lands not reported to be mineral lands, excepting a reservation of number 16 for schools, and such other reservations as the president might make, were directed to be sold on six months notice. And by the third section, rights of pre-emption were given to all those who

held leases from the secretary of war for mining purposes, who had complied with their leases, so that they were permitted to purchase at any time during their leases, at two dollars and fifty cents per acre; and such purchase was required to be made to the extent of the lease. Also, a right of purchase was given to those who were in possession by permit—provided the purchase was made before sale by order of the president. And also, the right of purchase was given to all who were in actual occupancy of mines, before the passage of the act, and who had paid rents. By the fourth section, all mineral lands, not occupied as above, were required to be sold in quarter sections, at not less than five dollars per acre; but not to embrace outstanding leases.

It is proper here to consider the effect of the above act of 1847. It withholds the mineral lands from sale under the general law. This is clear from the geological survey in which mineral lands were to be noted, the express provision that such lands should not be advertised and sold as the other lands, the pre-emption rights given to all who were in possession of mines, and the different prices at which such lands were permitted to be entered, without being offered at public auction. All the other lands, except section sixteen, which was reserved for school purposes, were to be sold. And lands not occupied nor claimed, on which there were mines, were not to be sold under five dollars per acre. If the mineral lands were withdrawn from the operation of the general law; if a different appropriation of them was made by the act of 1847, the sale to the defendants is a matter between them and the government. And here a question arises whether congress had power to dispose of section sixteen, as was done under this act. There is no controversy as to the fact, that a part of the school section is included in the patent of the defendant, which is referred to in his patent. And it is proved that the mine of the defendant, under the license, occupies a part of section 16—that from twelve to twenty thousand dollars have been expended on it, and one of the witnesses says, the mine is very rich, and worth two hundred thousand dollars. It must be observed that section 16, for school purposes, is not an absolute grant to the state. It was impossible to locate the grant until the surveys were made: there was this uncertainty on the subject; and to avoid any embarrassment arising out of this uncertainty, or the exercise of the powers of congress, it was provided, that where such section had been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to the state for the use of schools. This left congress free to exercise its discretion in selling or reserving section 16. The grant is fulfilled literally by giving any other section as near to section 16 as may be practi-

cable. By the act of 1847, all mineral land in the land district was reserved for special disposition. Now, the only objection to this reservation is, that it interfered with section 16 previously reserved for schools. The answer to this is, that section 16 was not given absolutely for school purposes; but only on condition that such section, when ascertained, should not have been sold or otherwise disposed of. This refers to the location of the tract by the surveys. But before this is ascertained, the mining lands within the district are not only reserved from the mass of the other lands, but an absolute right of pre-emption is given to those who occupy the mining lands, for mining purposes. The sale is made to them absolutely, if the land be embraced in the lease, and the terms of the lease have been complied with. The lease is proved in this case, and the rents have been punctually paid. All the conditions required to make the right absolute, if claimed, with the further condition that the miner shall purchase all the lands included in his lease, have been performed. And there seems to be no ground on which this purchase can be defeated, except by the prior vested right of the state to the school section. And it appears that no such right was vested in the state. It had a claim to a section, under the circumstances, as near to the section numbered 16 as practicable. Aside from the sale of this school section there is no hardship in the case, as the state receives what the United States were bound to give, and the state agreed to receive. In this view the sale was prematurely made, for the reservation of mining lands had disposed of a part of section 16, which must have been known to the purchaser, from the fact that large and expensive mining works had been constructed on the land, which were in operation at the time of the purchase and for years before, of which the purchaser is presumed to have had notice. The geological surveys too, which were filed in the general land office at Washington, and in the land office of the United States, in Michigan, which gave a description of the mineral lands in the district, might have been examined. The purchaser of this section from the state had at least the means of knowledge, and this is notice. But, this is not a question, gentlemen of the jury, which turns on notice. It is simply a question of power in the United States, to reserve the mineral lands and give a pre-emption right, as has been done in this case. Of this, as a matter of law, there would seem to be little doubt.

It has been long the policy of the United States to reserve mineral lands, salt springs, &c. Under the act of 8th May, 1786, the first act that authorized the sale of public lands, salt springs were reserved. The act of the 30th April, 1802 [2 Stat. 173], to authorize the people of the eastern division of the

Northwestern Territory to form a state, contained the above provision in relation to section 16. An act of congress, 3d March, 1803 [2 Stat. 226], provided, that the sections heretofore reserved for the use of schools, in lieu of section 16, as have been otherwise disposed of, shall be selected by the secretary of the treasury, out of unappropriated reserved sections most contiguous. Indiana and Illinois had the same reservation in regard to section 16. And by the act of 3d of March, 1807 [2 Stat. 437], mines in Indiana, then including Illinois, were reserved, and it was declared that all grants for the same should be void. This being the course of the government, it would seem that the power in congress to reserve the mineral lands in question cannot be doubted; and if you find, gentlemen, that the land now claimed by the plaintiff is, with the mineral land, claimed by the defendant, first under a license and now under a patent, you will find the defendant not guilty.

There is another question in the case which has not been pressed in the argument, and that is, the power of the state of Michigan to sell the school lands. They were held in trust by the state, and unless the donor, the government of the United States, should assent to the change in the trust fund, it is difficult to say that the state may sell and convey the lands. A trust must be executed in good faith, under the conditions of the donor. The United States, so far as appears in this case, have not assented to the sale, nor have they declared in what way the land shall be used for school purposes. Had the intention been that these lands should be sold, would not some act have so provided? In giving the lands, the most natural inference would seem to be, that a revenue from the use of the lands was designed, rather than a sale of them. A sale exhausts the fund, and the proceeds become mixed up with the funds of the state, and in the course of events, may be lost sight of. If all the school lands in the state have been sold, this question is of great interest to the state, as it would affect titles to a very large amount of property, and also the policy of the state in the application of the proceeds of the school lands. Verdict for defendant.

Exceptions were taken to the points ruled, and the case is now in the supreme court on a writ of error, and if the judgment shall be reversed, it will relieve the circuit court from a painful responsibility.

[NOTE. The plaintiff sued out a writ of error, and the supreme court reversed the judgment, remanded the cause, and directed a venire to issue.

[The court assigned, as ground for the reversal, that the act of March 1, 1847, did not have the effect to withdraw the mineral lands from the compact with Michigan; that whatever legal impediment existed to the compact with the state, either by section 2 of the act of 1847, which separated for some purposes the mineral lands from other public lands, or by the privileges granted to the lessees or their assigns in the third section of the act, was removed by the repealing clause of the act of 1850, and the noncompliance with the conditions on which the privilege depended, and, therefore, section 16 of the public land was at the date of the latter act disincumbered and subject to the operation of the compact; that the section in question was vested in the state of Michigan at the date of the entry by the Minnesota Mining Company, and the company acquired no title by its patent; that it was competent for the state to sell the school reservations without the consent of congress; that, the state not having complained of the sale, and retained the price paid, the patent should be regarded as conclusive of the fact of a valid and regular sale; and, further, that the jury should have been instructed that the facts, if true, entitled plaintiff to recover the premises in question. Cooper v. Roberts, 18 How. (59 U. S.) 173.

[On the new trial, the plaintiff recovered judgment. Defendant brought error, and the judgment was affirmed.

[The court declined to reconsider the points raised on the first appeal, and confined itself to the consideration of three questions, i. e. the refusal of the court to allow the reading to the jury of a deposition setting forth the opinions of some of the officers of the land office, and of the attorney general, in opposition to the view of the supreme court expressed on the former appeal, the refusal to admit certain evidence, and the refusal of an instruction involving the same question.

[As to the first point, the court held that the court below correctly refused to allow the reading of the deposition, stating in the principal opinion, delivered by Mr. Justice Grier, that "it is the province of the court to instruct the jury as to the principles of law affecting the case, and counsel cannot appeal to a jury to decide legal questions by reading cases to them, or giving in evidence the opinions of public officers."

[The evidence offered and overruled was as follows: "Defendant produced, and offered to prove, a deed of release from Alfred Williams and wife to the Minnesota Mining Company, dated June 20, 1856, covering the lands in controversy; and further offered to prove, in connection therewith, that, at the time when the said Cooper obtained the deed of the premises in controversy from Alfred Williams, the Minnesota Mining Company was in actual and open possession of the same, claiming title under their patent from the United States, and that the said Cooper knew of such claim and occupancy before and at the time of his purchase, and of said conveyance; that he obtained said title from Alfred Williams, he being the naked trustee of John Bacon, and that all the negotiations for the said purchase, and the purchase itself, were had between said Cooper and Bacon, the said Williams acting under the directions and for the benefit of said Bacon, and having or claiming no personal interest in said lands; that said purchase and conveyance were made for the following purpose, viz. that said Cooper should hold the same in trust for a corporation known as the National Mining Company, all of whose stock was held by said John Bacon, and, by the conditions of said sale, the said Cooper was to receive, and did receive, with said conveyance, six-tenths of the stock aforesaid, and the said Bacon was to retain, and did retain, four-tenths of said stock; that the said Cooper purchased said stock, and took said conveyance, with a full knowledge of the claims and occupancy of the Minnesota Mining Company, and with the intention of prosecuting the title purchased by him, by legal proceedings in this court, against the Minnesota Mining Company, for the benefit of the National Mining Company; and that, before said conveyance was delivered to him by said Williams, the said Cooper, in conjunction

with the said Bacon, applied to counsel in the city of Detroit to employ such counsel in the litigation aforesaid, which was to be had with the Minnesota Mining Company." As to that, the court held that the deed to the Minnesota Mining Company was for portions of the land not demanded in this suit, and, by itself, was not relevant. It could have no relevancy, unless to show the title to the plaintiff below to be void, because purchased and obtained with full knowledge of an adverse possession, and to support the following instruction, which was refused by the court below: "* * * If, when said Williams conveyed to said Cooper the premises in question, the said Minnesota Mining Company was in actual and open possession of said lands, claiming title thereto under their patent, the said conveyance was void in law against the said company, and all claiming under them,"—which instruction the court refused to give; and to this ruling the defendant excepted. As to this point, the court held that the possession of the mining company under claim of title, and Cooper's knowledge of it when he purchased, could not affect the validity of the deed of Williams to him, Rev. Code Mich. 1846, p. 262, enacting that "no grant or conveyance of lands, or interest therein, shall be void for the reason that at the time of the execution thereof such land shall be in the actual possession of another claiming adversely." Roberts v. Cooper, 20 How. (61 U. S.) 467.

[For denial of a motion by Cooper to require Roberts to give additional security for the prevention of the writ of error sued out by him, see Roberts v. Cooper, 19 How. (60 U. S.) 373.]